**Charles Edward TODD, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Sept. 4, 1986.

ward Todd was convicted of wanton murder and sentenced to life imprisonment.

On May 27, 1983, Todd summoned an ambulance for his mother from the residence of his aunt, Grace McKee. Mrs. McKee was an arthritic invalid with whom Appellant frequently stayed. Mrs. Todd also occasionally tended to her sister and evidently had been in the home since May 21.

When the ambulance driver arrived, he found Mrs. Todd on the living room floor and was told that she had fallen over a footstool. The driver thought this was suspicious inasmuch as the bruise on her injured leg was yellowish, indicating a trauma three to four days old; furthermore, she had additional bruises on other parts of her body. When he asked about Mrs. McKee, he was told by Todd that she was in her bedroom. Later in the day the ambulance dispatcher unsuccessfully attempted to contact the McKee home to advise where Mrs. Todd had been taken. Having also noticed a foul odor when he had been within the home, the driver subsequently indicated his concern for Mrs. McKee to the Beattyville Police Department.

When the police went to the home to investigate, there was no response, and Mrs. McKee could not be seen through her bedroom window. The officer and a deputy sheriff thereupon pried open the door and entered. After a search of the entry level of the house, Mrs. McKee's beaten body was discovered at the foot of the basement steps. According to the Lee County Coroner who was called to the scene, the condition of the body indicated that Mrs. McKee had been dead several days.

The local authorities notified the Kentucky State Police of the situation. They arrived shortly thereafter and conducted a thorough investigation of the scene. As a result of the search, many evidentiary items were seized among which were blood scrapings, a blood-stained pair of pants from the floor of Appellant's bedroom, and a hammer with blood found within a kitch-

Randall L. Wheeler, Asst. Public Advocate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., Carl T. Miller, Jr., Asst. Atty. Gen., Frankfort, for appellee.

WHITE, Justice.

This appeal is taken from the Estill Circuit Court in which Appellant Charles Ed-

en cabinet drawer. Defense moved below that these and all other items seized be suppressed as the result of a warrantless search.

Three days later a search warrant was obtained, and some bed linens and a cedar block of wood were taken. Suppression of these was sought based upon allegations that the affidavit supporting the warrant was insufficient.

The Circuit Court ruled against a broad exclusion. However, it concluded that suppression of individual pieces of evidence could be raised and considered during the course of trial.

At trial Mrs. Hazel Todd, Appellant's mother, was called by the Commonwealth. In an attempt to establish her as an eyewitness to the crime, she was asked if she had not seen Mr. Todd push down and beat up Mrs. McKee. When Mrs. Todd denied this, she was asked whether she also denied having told the detectives that. Her response was, "I might have; I don't know." A recurrent theme of the prosecution's examination was that while hospitalized, she had described an assault by Mr. Todd upon his aunt which had led to her death; however, in each instance Mrs. Todd asserted that she just couldn't recall what she had told. With respect to this testimony defense counsel asked that the jury be admonished that evidence of any prior inconsistent statements be considered only for impeachment purposes and not as substantive proof:

1. If the witness Hazel Todd was heard to make a statement at another time and place which contradicts or is inconsistent with her testimony at trial, that statement made out of court (if she did make it) is not to be considered by you to any degree whatever as evidence of the defendant's innocence or guilt, but only insofar as it may have a bearing, if it does so, upon the truthfulness of the witness' testimony.

This was rejected.

During the trial the Court ruled that the Commonwealth could ask of local police officers whether they were familiar with the relationship between Mr. Todd and Mrs. McKee; however, specific instances were not to be mentioned. Subsequently, a policeman, a deputy sheriff, and the sheriff testified concerning prior reports relating to Mrs. McKee. Included in this information were the facts that Mrs. McKee had been found beaten, that food had apparently been thrown against her bedroom walls, that bullet holes were seen in those walls and in her mattress, that a shotgun with a broken stock was found in the McKee home, and that on one occasion a warrant for Mr. Todd's arrest had been executed. Cross-examination revealed that Mrs. McKee had been the one to have posted bond after this arrest. An admonition covering this was sought and granted:

2. The testimony concerning reports of previous difficulties between Charles Todd and Grace McKee, if believed by you, may not be considered by you to any extent whatever as evidence of his innocence or guilt in this case, but may be considered only insofar as it may tend to show his state of feeling toward Grace McKee, if it does so, at the time of the alleged offense for which he is being tried.

As part of the investigation and autopsy procedures, over five dozen photographs of the nude and battered body of Grace McKee were offered into evidence by the Commonwealth. Defense objected to all as unnecessarily inflammatory and probative of nothing which would not also be proven by oral testimony. Further, it was urged that a suggestion of sexual abuse or rape was inherent in one. A hearing was held in which the lower Court concluded that all were admissible except those either revealing the body altered by autopsy or suggesting sexual abuse or rape.

The pictures were sorted through in chambers; however, the sexually indicative one was erroneously included amongst those admissible and was subsequently introduced by the Commonwealth. Appellant objected and asked for a mistrial. This was denied; however, the Court of-

fered to give an admonition which was not accepted.

Additionally, relating to the sexual aspect which was not to have been a part of this case, the Commonwealth developed that Mr. Todd had been given a "perk" test to aid in determining whether a rape had occurred and introduced pubic hairs identified as having been taken from the deceased and Charles Todd as part of the general investigation into the death. Objections and motions for mistrial with reference to both were overruled.

Prior to trial Mr. Todd sought psychiatric evaluation to aid in his defense. He was referred to the Kentucky Correctional Psychiatric Center which reported that in all medical probability he was competent to stand trial and that "[i]f this was his condition on the day of the alleged crime then in probably (sic) this patient had a substantial capacity to appreciate the criminality of his conduct or to have conformed his conduct to the requirement of the law on the day of the alleged crime." Appellant's motion for appointment of an independent psychiatric examiner to consider insanity, intoxication, and extreme emotional disturbance as defenses or mitigation was overruled.

Also, prior to trial Appellant moved for the dismissal of the petit jury panel inasmuch as it allegedly was not constituted in accordance with KRS 29A.050(4)(b). Were that statute followed, Mr. Todd argued, there would have been a total of 669 names in the juror wheel; instead there were between 608 and 610. It was further argued that women were demonstrably underrepresented in the petit jury in violation of the Sixth and Fourteenth Amendments, U.S. Constitution.

Having identified the relevant facts, we turn to the issues addressed by Mr. Todd. He begins by asserting that he was denied due process and equal protection when the lower Court denied his motion for evaluation by an independent psychiatrist. He urges that such would have aided in presenting a defense or mitigation through insanity, intoxication, or extreme emotional disturbance.

█ We would first note that Mr. Todd was indicted for wanton murder, KRS 507.-020(1)(b). Particularly on point is the definition of the mental state of "wantonly" found within KRS 501.020 which concludes: "A person who creates such a risk [a substantial and unjustifiable risk that a result will occur] but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto." Accordingly, irrespective of a psychiatric examination, intoxication would not have been a factor in Mr. Todd's defense.

█ The Penal Code also addresses the question of extreme emotional disturbance. KRS 507.020(1)(a) establishes it as a mitigating element (to be negated by the Commonwealth upon production by the defendant) to a murder which was specifically intended. However, extreme emotional disturbance statutorily plays no role in the crime with which Mr. Todd was charged, wanton murder under KRS 507.020(1)(b). Extreme emotional disturbance under our code affects one's formation of the *specific* intent to murder, but as KRS 507.020 is drafted, it has no carry-over application to one's *wanton* behavior in creating a grave risk of death. Thus, Appellant cannot be heard to complain that he was unable to develop such through an independent psychiatric examination.

That aside, with the question of insanity, which *is* an actual defense, KRS 31.185 provides:

Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. If he considers their use impractical, the court concerned may authorize the use of private facilities to be paid for on court order by the county.

█ Appellant has not established that the lower Court abused its discretion in denying payment for private facilities. In his original motion he asked for evaluation of his mental condition at the time of the offense independent of that which might be

performed at a state facility. Such in no way challenges the practicability of available state facilities but rather seeks additional services before that state exam had even been performed. It is not questioned but that an indigent defendant such as Mr. Todd is entitled to reasonably necessary expert assistance; however, was he aggrieved when state facilities were available to and actually used by him?

Thereafter, Appellant renewed his request for private examination, citing the fact that the state report had not addressed the questions of insanity, intoxication, and extreme emotional disturbance. Several comments may be made in response thereto: First, nothing had been filed by Appellant to indicate that he intended to raise insanity as a defense. KRS 504.070(1). *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Second, Mr. Todd had a history of treatment for mental health problems. He could have submitted those records to have established before the lower Court a definite proclivity towards possible insanity; however, instead on his own request these were filed on a sealed basis, to be opened only for appellate review. Nevertheless, we cannot review these records and make a determination on the *factual* matter of Mr. Todd's history when the trial court has not had the similar prior opportunity; this is axiomatic of appellate practice. Thirdly, appellant was not without recourse. Although it is true that the report from the Kentucky Correctional Psychiatric Center did not reach a specific finding on the question of Mr. Todd's sanity at the time of Mrs. McKee's death, there was nothing to preclude Appellant from seeking that the report be expanded to include this very matter. The absence of this information does not in and of itself automatically trigger the need for a *second* evaluation by an independent agency.

Mr. Todd next questions the matter of the seizure of several items as a result of the warrantless search by the Kentucky State Police after the McKee premises had been secured by local authorities. An examination of Appellant's motion to sup-

press and presentation at the hearing thereon indicates that his issue has been reframed for appeal. In the motion it was alleged that:

(1) On May 27, 1983 agents of the Lee County Sherrif (sic) made a forced entry into the dwelling occupied jointly by Charles Todd and Grace McKee;

(2) While in the residence the officers discovered the body of Grace McKee and other items and material which the Commonwealth intends to introduce evidence of at trial;

(3) This warrantless entry of the defendant's residence was not based upon probable cause nor justified by exigent circumstances, and therefore violated the constitutional prohibitions against unreasonable searches and seizures.

At the hearing counsel argued:

... there's a warrantless entry into the residence of Mr. Todd and Mrs. McKee in which her body was discovered. In fact, it was a breaking and entry, they had to break a door to get in, and as I say, there was no warrant on that, and I think there is a pretty strict rule against or a presumption against the legality of a warrant to search a house, and in this instance it is our allegation there was neither probable cause nor exigent circumstances, and there has to be a showing of both to be entitled to make a warrantless search, so that's a matter we need to take evidence on.

■ Clearly Defendant below pitched his argument on this matter to the alleged absence of probable cause and exigent circumstances which would have permitted the Lee County Sheriff's Department to have entered the premises of Grace McKee. Under the facts outlined above, however, no serious challenge could have been raised against the emergency exigent circumstances at the time, in particular that there was no response at the McKee home and that Mrs. McKee, virtually a total invalid, was not in her bed when the officers looked through the windows. As stated in *Mincey v. Arizona*, 437 U.S. 385 at 392, 98 S.Ct.

2408, 2413, 57 L.Ed.2d 290 (1978): "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."

Mr. Todd's second allegation for suppression in his written motion to suppress was

(4) On May 28, 1983, Trooper Robert J. Fauste of the Kentucky State Police submitted an affidavit in application for a search warrant, which led to the issuance of a warrant to search the premises on May 30, 1983;

(5) Trooper Fauste's affidavit asserted only that he was the investigating officer and that he "verily believes" that material evidence was on the premises; (sic) It did not disclose any facts or observations which would support the affiant's assertion of the ultimate fact of the presence of evidence, and was therefore not sufficient to permit an independent judicial determination of probable cause;

(6) Evidence seized incident to the execution of a warrant issued upon a conclusary (sic) and insufficient affidavit must be suppressed as the product of a violation of the Fourth Amendment and Section 10, *Johnson v. Commonwealth*, 443 S.W.2d 20, 23–24 (Ky.App.1969) *Henson v. Commonwealth*, 347 S.W.2d 546 (Ky. App.1961);

(7) Had the affidavit and warrant been valid, the evidence would still be subject to suppression since the affidavit and warrant were presumably derived from knowledge obtained by the initial warrantless and unlawful entry, and are therefore "fruit of the poisonous tree," *Silverthorne v. U.S.*, 251 U.S. 385, 40 S.Ct. 182 [64 L.Ed. 319] (1920).

At the hearing this was reiterated:

There is a second grounds for the suppression which is the re-entry of the house to actually take up all the samples that was pursuant to a warrant that is only full of conclusory (sic) allegations

and didn't set forth sufficient facts from which an independent magistrate or judge could have determined whether there was probable cause to believe what Detective McIntosh had sworn to was true or not, and I don't think that needs evidence. . . .

As noted, no evidence was taken on this aspect, and the motion to suppress was denied.

■ We have presented the above in detail to reflect its sharp contrast with that which we are presently being asked to consider, to wit *not* that the initial entry was without exigent circumstances or that the affidavit supporting the subsequently obtained warrant was inadequate but rather that "Appellant was denied due process of law by the admission of testimony and items obtained as a result of a warrantless search of Appellant's residence after the residence had been secured."

This latter concern was never presented to the trial court for a ruling; thus, accordingly there was no action thereon for appellate review. " . . . The policy of RCr 9.22 and 10.12 is to require a defendant in a criminal case **to present to the trial court those questions of law which may become issues on appeal.** The appellate court reviews for errors, and a nonruling is not reviewable when the issue has not been presented to the trial court for decision." *Turner v. Commonwealth*, Ky., 460 S.W.2d 345, 346 (1970).

"Appellate practice is a science. Members of the legal profession are required to know and to carefully comply with the rules pertaining thereto." *White v. Hardin County Board of Education*, Ky., 307 S.W.2d 754, 756 (1957).

Mr. Todd's next issue is framed that "The trial court erred to Appellant's substantial prejudice and denied Appellant due process of law when it allowed the prosecution to question Appellant's mother about a prior inconsistent statement which it did not support by evidence and failed to admonish the jury that the evidence could not be considered substantively." We are told

that this issue has been preserved by Appellant's admonition, cited above, subsequently submitted with the instructions.

■ Looking to the point of preservation upon which Mr. Todd relies, it is evident that there was no challenge regarding whether the reference to a prior inconsistent statement was supported; rather, the concern is only upon limiting its use to impeachment. Accordingly, those portions of Appellant's present argument relating to the prosecution's failing to support its factual predicate with evidence and the interjection of an issue not supported by evidence as well as his belated challenge to the impeachment itself are not properly before us. Our review is limited to whether the lower Court erroneously rejected the submitted admonition that the reference to Mrs. Todd's prior inconsistent statements be considered for impeachment purposes only. Had Appellant wished to have made an issue of the Commonwealth's failure to have supported the reference through a proper foundation and introduction, the place to have done so was before the Estill Circuit Court. It is not the function of the Supreme Court to consider matters which were waived by nonassertion below.

Under *Jett v. Commonwealth*, Ky., 436 S.W.2d 788, 792 (1969), out-of-court statements "may be received as substantive evidence through the testimony of another witness, and need not be limited to impeachment purposes." We do not question that the prior inconsistent statement was not actually introduced as is necessary for either impeachment or substantive use. Accordingly, Appellant *could* have required of the lower Court that the jury be told that the reference not be considered for *any* purpose or have moved for a mistrial.

■ Through his proffered admonition, however, Appellant in essence concedes introduction for purposes of impeachment but attempts contradictorily to reject such for substantive application. Such inconsistency cannot be entertained. Once a waiver has been made, the cat is out of the bag, and its utilization is perforce unlimited. If it is sufficient to support impeachment, by the same token it must be deemed sufficient to uphold substantive consideration. The Circuit Court properly recognized that Appellant could not have it both ways, as his admonition sought, and properly rejected same.

■ Mr. Todd's fourth contention is that error was committed through the admission of irrelevant, incompetent, and inflammatory evidence of uncharged conduct, in particular matters relating to sexual abuse, alleged prior assaults, and bullet holes and a shotgun found in Mrs. McKee's home. On the matter of alleged prior assaults, we find no difficulty in accepting the testimony thereon as indicative of the "state of feeling" between Mr. Todd and his aunt as would tend to establish motive. Towards this end one particular instance was related to the trial court in which an arrest warrant was actually served upon Mr. Todd for violence against Mrs. McKee. The jury was correctly informed under Admonition 2, cited above, as to how to use this information, and we can find no error in its admission.

■ With respect to the bullet holes and shotgun, however, error must be found. A local officer was asked whether he had received reports concerning Mr. Todd and his aunt. When he responded affirmatively, he was then asked what he had found when he acted on these reports. The officer described finding Mrs. McKee badly beaten, bullet holes around her bed and in her mattress, signs of a shotgun having been fired throughout the house, and food thrown against the bedroom walls. A continuing objection to this line of questioning was overruled. Although this information certainly indicates that extraordinary violence had occurred, no foundation was laid by the Commonwealth to connect this scene with the defendant. The jury was left with the assumption that the chaos had been created by Mr. Todd, and well it may have; however, without a proper basis substantively linking Appellant to same, it was error to have permitted the testimony.

On the matter of the shotgun, midway through the trial the Court specifically recognized that it was immaterial and prejudicial and upon defense's request ordered that the Commonwealth not elicit evidence concerning it. Nevertheless, the Commonwealth subsequently asked of an investigating detective, "Did you see a shotgun there or anything like that?" to which he replied, "Yeah, I seen . . ." before being interrupted by defense counsel's objection and motion for a mistrial. Despite the Court itself's posing the unanswered question of the purpose of introducing the shotgun, it overruled Appellant's requests. Mrs. McKee was not shot, and there was nothing whatsoever developed to connect a shotgun with her death. Therefore, it must be held that it was error for the lower Court to have permitted the Commonwealth to have pursued questioning about the shotgun, a totally irrelevant concern.

Additional significant and insurmountable concerns exist regarding the other evidence and testimony challenged by Appellant. Involvement of sex into the case came via the above-referenced photographs. Despite the fact that a particular one suggesting rape or sexual abuse was to have been eliminated, the Commonwealth presented same to the jury. Defense's motion for a mistrial was rejected, with the Court's suggesting that counsel had erred by not verifying its exclusion in chambers after the pictures had been sorted through. An admonishment was offered instead.

Later in the trial Sergeant D.K. Dameral of the Kentucky State Police was asked by the Commonwealth if he had received information concerning the death of Grace McKee. To this he responded that he had transported Mr. Todd to the Madison County jail and requested that he submit to a "perk" or rape test. Defense counsel immediately made a motion for a mistrial based on the fact that neither rape nor any other sexual concern was involved in the crime charged. The Commonwealth was unable to justify its introduction, arguing only that the trooper had been told not to bring that out.

On appeal we are asked to overlook this inasmuch as Appellant had not accepted an admonishment offered by the Court. Appellant's position was that such would only draw additional attention to the matter and rejected the admonition; however, some attempt was made to cure the trooper's slip by allowing him to testify further that the test on Mr. Todd was negative.

The last sexual reference was to the fact that as part of the perk test pubic hairs from Mrs. McKee were compared with those of Mr. Todd. This line of questioning came *after* the Commonwealth's Attorney had informed the Court that he had advised Sergeant Dameral that rape was not an issue and that sexual concerns should not be raised and *after* the Court had agreed with the defense that references to a suggestion of rape were improper. In response to defense motion for a mistrial, the Court responded that the Commonwealth hadn't mentioned rape, that it was "just" introducing pubic hairs.[1] Nowhere in the lengthy transcript below or in Appellee's brief before us is there even a hint of a use such a comparison could hope to yield but of the involvement of sex in the beating death.

No one argues that sexual implications had any place in this case. Indeed during the progress of the trial, on assorted occasions reference to the specific exclusion of sexual matters was made. Nevertheless, the Commonwealth offered that spectre to the jury on at least three occasions. We can scarcely hold that this was nonprejudicial given the inflammatory nature of the suggestion, especially in the context of a brutal beating.

We are next asked to address the matter of the approximately sixty photographs of Mrs. McKee's battered, nude body. The Commonwealth argues that they were relevant to establishing her cause of death even though Mr. Todd had offered to stipulate that the injuries shown therein were the cause.

We have no quarrel with the citation to *Gall v. Commonwealth,* Ky., 607 S.W.2d

97, 107 (1980), offered by the Commonwealth in which it was stated:

It is no answer to say that defense counsel offered to stipulate the essential facts proved by the pathologist and illustrated by the photographs, hence they were unnecessary. The Commonwealth has a right to prove its case to the jury even when the defendant pleads guilty. The defendant is not entitled to erase the ugly parts of the picture and substitute words in their place. In order for a jury to be able to size up a case fairly and wisely it must be allowed to gain a reasonable perspective, and that can best be done by permitting it to see an unadulterated picture. We are of the opinion that the photographs here in question were admissible.

■ Before us Mr. Todd yields a bit on the question of admissibility and argues that the prejudicial error was in the vast number of pictures admitted. Unfortunately, however, this position was never put before the lower Court. Objection below was based entirely upon their not adding anything to the Commonwealth's case and their potentially inflammatory nature, concerns correctly addressed by *Gall.* We have been cited to no mention of Appellant's present concern over numbers. We again remind that this Court is one of *re*-view which by definition presupposes prior consideration by the trial court. If such has not been done, there accordingly can be no review by this Court, and we have no authority to proceed in a *de novo* manner with respect thereto.

Mr. Todd's final contention is that the petit jury panel should have been dismissed for failure to have complied with statutory procedures for the selection of the names of prospective jurors. It is evident that through there being only 608 or 610 instead of 669 names in the jury wheel, there was deviation from KRS 29A.050(4)(b). The ramification of this deviation, however, need not be discussed. Inasmuch as reversible error attaches to the introduction of sexual concerns and testimony about the bullet holes and shotgun, retrial must be directed. We are confident that the petit jury involved therein will be statutorily correct.

The judgment of the Estill Circuit Court is reversed and the case remanded for a new trial consistent with this opinion.

All concur except WINTERSHEIMER, J., who files a dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent because I believe the errors noted by the majority did not result in an unfair trial for the accused. The law does not require that a defendant receive a perfect trial, but only a fair trial. *See Michigan v. Taylor,* 417 U.S. 433 at 446, 94 S.Ct. 2357 at 2364, 41 L.Ed. 182 (1974). A careful reading of the extensive record indicates that no essential unfairness occurred.

Considering the quality and sufficiency of the evidence presented to the jury, I do not believe the trial errors were significant enough to require reversal. The claims of error are nonprejudicial because consideration of the entire case does not indicate that there is any substantial possibility that the result would have been any different. *Abernathy v. Commonwealth,* Ky., 439 S.W.2d 949 (1969); RCr 9.24.

There was no reversible error in the rulings by the trial court on the numerous objections including those which relate to the introduction of allegedly inflammatory evidence of uncharged conduct. It was not reversible error for the trial court to admit into evidence photographs of the deceased victim taken at the scene of the crime and during the autopsy. In this age of television news coverage, jurors are able to view the picture of the body of a crime victim without prejudice to the defendant. *Napier v. Commonwealth,* Ky., 426 S.W.2d 121 (1968).

I would affirm the conviction in all respects.